(C.D. 4255)

C. J. Tower & Sons of Buffalo, Inc. *v.* United States

United States Customs Court, First Division

(Decided August 18, 1971)

*Barnes, Richardson & Colburn* (*Joseph Schwartz, David O. Elliot*, and *Irving Levine* of counsel) for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Robert E. Burke, Patrick D. Gill, John A. Gussow*, and *Andrew P. Vance*, trial attorneys), for the defendant.

Before Watson, Maletz, and Re, Judges

Watson, Judge: These nine protests consolidated for the purpose of trial, place in issue the classification of certain merchandise described on the invoices as "Mixed Acidulated Foots", imported from Canada during the years of 1963 and 1964. The merchandise was classified pursuant to item 491.00 of the Tariff Schedules of the United

States as artificial mixtures of two or more of the fatty substances provided for in subpart A of part 13 of schedule 4 and assessed with duty at the rate of 10.5% ad valorem, but not less than the highest rate applicable to any component. That highest rate was found to be the duty of 1.5¢ per pound plus 10% ad valorem provided for in item 490.14 for other fatty acids of animal origin.

Plaintiff contends that the merchandise is properly classifiable pursuant to item 184.75 of said tariff schedules as other animal feeds and ingredients therefor, not specially provided for, dutiable at the rate of 10 per centum ad valorem. At the trial plaintiff amended its protest to add two alternative claims, as waste and scrap not specially provided for pursuant to item 793.00, dutiable at the rate of 4% ad valorem and as nonenumerated articles not provided for elsewhere in the tariff schedules pursuant to item 799.00 and dutiable at 10% ad valorem.

The record consists of the testimony of seven witnesses for the plaintiff and the official papers.

The relevant statutory provisions are as follows:

### Tariff Schedules of the United States

Classified under

Schedule 4, Part 13:

#### Subpart A. – Fatty Substances

\*        \*        \*        \*        \*        \*        \*

Fatty substances, not sulfonated or sulfated, and not specially provided for:
   Fatty acids:
      Of animal (including marine animal) origin:

\*        \*        \*        \*        \*        \*        \*

490.14         Other _____ 1.5¢ per lb., + 10% ad val.

\*        \*        \*        \*        \*        \*        \*

491.00   Artificial mixtures of two or more of the fatty substances provided for in this subpart or in part 8A of this schedule, not specially provided for_____ 10.5% ad val., but not less than the highest rate applicable to any component

Claimed under

Schedule 1, Part 15:

Subpart C headnotes:

   1. For the purposes of this subpart—(a) the term "animal feeds, and ingredients therefor" embraces products chiefly used as food for animals, or chiefly used as ingredients in such food, respectively, * * *

\*          \*          \*          \*          \*          \*          \*

   Animal feeds, and ingredients therefor, not specially provided for:

\*          \*          \*          \*          \*          \*          \*

184.75    Other _____    10% ad val.

\*          \*          \*          \*          \*          \*          \*

Schedule 7, Part 13:

793.00    Waste and scrap not specially provided
          for _____    4% ad val.

Schedule 7, Part 14:

   Any article, not provided for elsewhere in these schedules:

      \*          \*          \*          \*          \*          \*          \*

799.00    Other _____    10% ad val.

The testimony yields the following information regarding the production of the product known as "mixed acidulated foots." In this matter we have drawn heavily on the testimony of Mr. Harold G. Willsie, edible production manager of Lever Brothers, Ltd. of Toronto, Canada, the manufacturer and shipper of the merchandise at bar. Mixed acidulated foots are a residual or by-product of the principal business of the edible products division which is to manufacture such products as shortening, margarine and bulk edible oil from such crude oils as herring oil, whale oil, vegetable oil, tallow, soybean oil, cottonseed oil and coconut oil. These crude oils go through a purification or refining process involving the use of a caustic, a bleaching agent, washing and deodorizing. At each of these stages fatty acid remains in the caustic, the bleaching agent, the residual wash water and the deodorizing agent. This fatty matter is recovered from these sources as well as from the sump of the vacuum system and the dirty oil and floor sweepings, as well as overage and discarded margarine. The residual materials are treated with sulfuric acid in a process described as "acidulation" resulting in a conversion to fatty acid and sodium sulfate. This product, known as "mixed acidulated foots," is then thoroughly washed to remove all traces of sulfuric acid or any

mineral acid. In its final form it contains cottonseed oil, herring oil, menhaden oil, whale oil, lard, tallow and margarine returns.

The remaining witnesses offered testimony regarding the use of mixed acidulated foots, testimony which we find sufficiently comprehensive in time and scope and sufficiently convincing to establish the chief use of the product. Mr. Howard Polin, president of the Bishop Processing Co. of Selbyville, Delaware, testified that his company used mixed acidulated foots for blending with converted chicken offal and chicken fat materials into a protein used as animal feed. He knew of no other use for mixed acidulated foots.

Mr. Philip McLaughlin, secretary and purchasing agent of Adams Laboratories, Inc. of Westlawn, Pennsylvania, testified that his concern, which has plants located in Pennsylvania, Virginia, Louisiana, Iowa and Illinois, uses mixed acidulated foots in the production of blended feed which is sold to both poultry and livestock manufacturers located within two to three hundred miles of the various plant locations. The witness knew of no other use for mixed acidulated foots.

Mr. George M. Denes, a buyer in the fats and oil division of the New York and Chicago offices of Lever Brothers, U.S.A., testified that for the past 15 years he has sold mixed acidulated foots exclusively to the feed manufacturing industry and has never been able to sell them to fatty acid processors.

Mr. Russel T. Smith, the director of purchases for Emery Industries, Inc. of Cincinnati, Ohio, a manufacturer of fatty acids, testified that he never purchased mixed acidulated foots for use in fatty acid processing. In his opinion mixed acidulated foots would be unsuitable for fatty acid processing which requires pure acidulated foots derived solely from one origin.

Mr. William L. Hasselman, the proprietor of Hasselman Brokerage Company in Scarsdale, New York, testified that his firm handles anywhere from 33% to 50% of all the free available materials such as mixed acidulated foots, in this country. He testified that with the exception of sales to one particular chemical firm of a special blend of corn and soya mixed acidulated foots, representing about 20% of his sales of mixed foots, it was his experience that all sales of mixed acidulated foots have been to blenders of feed ingredients for feed manufacturers.

Mr. John L. Davenport, the principal partner of the Chicago Brokerage Company of Chicago, Illinois, testified that since 1960 all sales of mixed acidulated foots have been only to the feed industry, principally to those who process the material into a feed ingredient for sale to feed manufacturers. Such sales have been to processors of poultry and livestock feed through the South, East and Far West.

In the opinion of the court, the above summarized testimony ade-

quately supports plaintiff's claim that the chief use of the product known as "mixed acidulated foots" is as a feed ingredient.

The testimony above summarized is by men who deal in the same kind of merchandise as that imported and is entitled to great weight on the issue of chief use. *United States* v. *The Baltimore & Ohio R.R. Co., etc.,* 47 CCPA 1, C.A.D. 719 (1959). *Klipstein* v. *United States,* 1 Ct. Cust. Appls. 122, T.D. 31120 (1910).

The testimony by Mr. Willsie establishes that the importation consists of the product known as "mixed acidulated foots." The testimony of the remaining witnesses covers a representative cross section of the country and a convincing and comprehensive representation of those involved in such trade both in its sale and its use.

Defendant strenuously contends that there has been a failure to identify the importation herein as indeed consisting of mixed acidulated foots and further that the above summarized testimony relates only to the uses of the importation at best and does not establish the chief use of the general product known as "mixed acidulated foots." Defendant's contentions are based on a strained and narrow analysis of minute portions of the testimony. We are of the opinion that when viewed in its entirety, the testimony does not possess these deficiencies. It is our opinion that Mr. Willsie's testimony sufficiently identified the importation as belonging to the class of merchandise known as "mixed acidulated foots" and the remaining testimony is not limited strictly to the uses of the imported shipment but refers rather to the general uses of mixed acidulated foots in the trade of the United States.

Since the evidence establishes that the chief use of mixed acidulated foots is as an ingredient in animal feed, it follows that the importation is described both under item 491.00 by reason of its composition and item 184.75 by reason of its use. It is the general rule of customs law that a description by use will prevail over a description by general classification or composition. *Henley & Co., Inc.* v. *United States,* 49 CCPA 41, C.A.D. 793 (1962). *Jack & Jill Togs, Inc.* v. *United States et al.,* 47 CCPA 149, C.A.D. 749 (1960). It is clear that the provision for animal feed is more specific than that for mixtures of fatty substances and in accordance with the provision of General Interpretative Rule 10(c) of the General Headnotes and Rules of Interpretation of TSUS, it will control the classification of the importation herein.

In light of the above, we find that the importations are properly classifiable pursuant to item 184.75 of the Tariff Schedules of the United States as other animal feeds and ingredients therefor not specially provided for with duty at the rate of 10% ad valorem.

Judgment will issue accordingly.